Anne P. Humphrey v. Commissioner. Laura Brown Waggoner, Formerly Laura Humphrey v. Commissioner. Albert Patterson Humphrey Deceased v. Commissioner. Irene Humphrey v. Commissioner. Layton Humphrey v. Commissioner. Joe A. Humphrey v. Commissioner.
Humphrey v. Commissioner
Docket Nos. 4639, 4640, 4641, 4642, 4643, 4644.
United States Tax Court
1946 Tax Ct. Memo LEXIS 287; 5 T.C.M. (CCH) 21; T.C.M. (RIA) 46004; January 18, 1946
*287 R. B. Cannon, Esq., for the petitioners. Homer J. Fisher, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: By these proceedings petitioners seek redetermination of deficiencies in income tax, and challenge the determination of penalties, for the respective petitioners for the years and in the amounts as follows: Year 1940
Year 1941
Deficiency
Deficiency
Petitioner
in Tax
Penalty
in Tax
Penalty
Total
Anne P. Humphrey
$ 4,339.16
$216.96
$ 9,720.74
$ 486.04
$14,762.90
Laura Brown Waggoner
899.03
44.95
943.98
(formerly Laura Humphrey)
Albert Patterson Humphrey
4,339.16
216.96
9,720.74
486.04
14,762.90
(Deceased)
Irene Humphrey
3,114.98
155.75
3,270.73
Layton Humphrey
4,139.60
206.98
7,431.15
371.56
12,149.29
Joe A. Humphrey
1,256.49
62.82
16,645.57
832.28
18,797.16
Totals
$14,973.44
$748.67
$46,633.18
$2,331.67
$64,686.96
The penalties are 5 percent for negligence. Numerous independent issues are presented, some of which are common to all petitioners and others applicable only to individual petitioners. The applicability thereof will *288 appear from the statements of the issues and the facts relating to them. Several of the original issues have been disposed of by the facts which have been stipulated by the parties. Their final result may be given effect in the recomputation under Rule 50. The remaining questions are: (1) Did respondent correctly determine the remaining basis for depreciation of oil lease and well equipment of Joe A. Humphrey Company by reducing the original cost by the entire amount of depreciation theretofore allowed? (2) Was income received by Joe A. Humphrey Company in 1940 in the amount of $7,000 by reason of the receipt and maturing of a note in that amount in payment of stud fees? (3) Did the amount of $3,459.97 in 1940 constitute business income of Joe A. Humphrey Company or gambling gains of Joe A. Humphrey, individually; and did Joe A. Humphrey suffer gambling losses in 1940 and 1941 and, if so, are they applicable as offsets to the asserted gambling gains for 1940 and the admitted gambling gains for 1941? (4) Is the income of $47,431.04 realized by Joe A. Humphrey Company in 1941 from the payment to it of notes which it held of Ellis Petroleum Company taxable as ordinary income *289 or as capital gain? (5) Did the payment by Joe A. Humphrey Company of $8,500 in 1941 as its endorsement liability upon a note of C. F. Browing result in a deductible item either as a loss or bad debt? (6) Is Humphrey Borthers partnership entitled to deduct $18,000 in 1941 as intangible drilling and development costs on the Ortega lease well No. 2? (7) Is any additional depreciation over that allowed in the notice of deficiency allowable on the Ortega lease? (8) Is part of each of the deficiencies involved herein due to negligence so that petitioners are liable for the 5 percent penalty under Internal Revenue Code, section 293? The cases were submitted upon the pleadings, oral and written stipulations, and evidence adduced at the hearing. Those facts hereinafter appearing which are not stipulated facts are otherwise found from the record. Findings of Fact The stipulated facts are hereby found accordingly. Throughout the calendar years 1940 and 1941 petitioners Anne P. Humphrey and Albert P. Humphrey * (husband and wife), Layton A. Humphrey, and Joe A. Humphrey were members of the partnership, Joe A. Humphrey Company, which was engaged in the oil *290 business and had its offices in Dallas, Texas. Anne P. Humphrey and Albert P. Humphrey had a one-half interest, and Layton A. Humphrey and Joe A. Humphrey each had a one-fourth interest in the partnership. This partnership kept its books on an accrual basis. Laura Brown Waggoner was the wife of Joe A. Humphrey until their divorce on November 17, 1940. Irene Humphrey was married to Layton Humphrey on March 21, 1941, and they continued to be husband and wife from that date. Under the laws of Texas all of the income and deductions of Anne P. Humphrey and Albert P. Humphrey for the years 1940 and 1941 were the community income and deductions of these two petitioners; all the net income and deductions of Joe A. Humphrey and Laura Brown Waggoner from January 1, 1940, to November 17, 1940, were the community income and deductions of these two petitioners; and all the income and deductions of Irene Humphrey and Layton Humphrey from and after March 21, 1941, were the community income and deductions of these two petitioners. 1. Depreciation on Well Equipment The partnership, Joe A. Humphrey Company, first acquired producing oil and gas properties in 1935. From *291 that date through December 31, 1939, depreciation on the lease and well equipment located on these producing properties was calculated and allowed by respondent on the straight-line method without any provisions for the salvage value, if any, of the lease and well equipment. In calculating the allowable depreciation sustained. with respect to the lease and well equipment in the taxable years 1940 and 1941, respondent abandoned the method of calculating depletion theretofore used, and for the first time in determining the remaining basis at the beginning of the taxable year reduced the original investment in lease and well equipment not only by depreciation allowed or allowable in prior years but also in very substantial amounts determined by him to represent the salvage value of such lease and well equipment at the end of its useful life. 2. Andrade Note Sometime before 1940 Joe A. Humphrey, acting for the partnership, commenced to loan money to T. P. Morgan who owned a string of racing horses. The first loans to Morgan were made to him in New York. As security for these loans Morgan executed a chattel mortgage on his racing stable. Thereafter additional funds were loaned or advanced *292 to Morgan, and eventually these loans were secured by chattel mortgage on all Morgan's horses, being about 140 or 150 in number. From time to time the expenses of shipping, feeding, and training horses were advanced to Morgan under an agreement whereby the advances were to be repaid in full, together with interest. In the interim all of Morgan's receipts from his stable were pledged to secure repayment of the advances and it was agreed that when and if the advances had been repaid in full the lender was to receive a one-half interest in the horses. This never came about but Joe Humphrey finally consummated an agreement whereby he could sell a one-half interest in the horses to obtain payment. The books of Joe A. Humphrey Company carried an account under the name of Morgan beginning with a debit entry dated March 16, 1940, in the amount of $2,000 and showing various debits and credits up to the end of 1940, when the excess of debits over credits in the amount of $5,687.86 was charged to profit and loss and the amount was deducted in full as a loss under the schedule. "commissions and miscellaneous income" in the partnership income tax return of Joe A. Humphrey Company for the year *293 1940. The account with Morgan was resumed in May, 1943, and carried to November, 1944. There was a written contract between either Joe A. Humphrey or T. P. Morgan and C. Andrade, III, for the breeding by Morgan's stallion of certain mares that Andrade owned. The consideration to be paid by Andrade under the contract was $16,000 of which $9,000 was to be paid in cash and $7,000 by note. Of the $9,000 paid during 1940, only $5,000 is clearly indentifiable in the Morgan account on the Joe A. Humphrey Company books. The note dated January 26, 1940, for $7,000 was executed and delivered by Andrade, payable to Joe A. Humphrey. On the face of the note was written "non-negotiable"; the note was due September 15, 1940, and bore interest at the rate of 6 percent from date of maturity until paid. Collection of the note was attempted on September 15, 1940, and Andrade refused to pay it, saying that some of his mares were not in foal and he wanted return privileges on them. Andrade discovered that the Morgan stallion was not available in November, 1940. Joe A. Humphrey decided to wait and see how many of the mares actually foaled before pressing the issue further. In the first part of 1942 *294 Joe A. Humphrey stated to a revenue agent that he intended to collect the Andrade note for $7,000 by suit if necessary. On February 18, 1943, a new note for $7,000 was given by Andrade to Joe A. Humphrey, secured by a mortgage on an interest in certain oil property, and Andrade agreed to apply certain proceeds, in the event of sale of this interest, to the payment of the note and to pay the note in any event. The note was paid and cancelled by transfer to Joe A. Humphrey of an oil payment in the face amount of $22,000 and $4,000 cash. No credit is reflected in the Morgan account for the $7,000 payment. The Andrade note was worth $7,000 when received by Joe A. Humphrey Company in 1940. 3. Gambling Transactions During 1940 Joe A. Humphrey, individually, had several wagering transactions. During that year he won a total of $3,459.97 from Morgan in card games. The amount was not paid to Joe A. Humphrey in cash but Morgan gave him a $2,000 note executed by Weiss, and a credit he had coming from Jake Freedman of $450 and approximately $1,000 in cash. Humphrey went to Houston, Texas, to collect the Weiss note and while there entered into some wagering transactions with Freedman, *295 resulting in losses to Joe A. Humphrey of approximately $4,950 which he settled by delivering to Freedman the $2,000 Weiss note and the $450 debt owed by Freedman to Morgan and $2,500 in cash. In 1940 Joe A. Humphrey also lost $1,600 to Andrade in card games. No part of the sum of $3,459.97 included by respondent in the Joe A. Humphrey Company income as "additional collections" constituted the property or income of Joe A. Humphrey Company but represented the personal wagering gains of Joe A. Humphrey, individually. In 1941 Joe A. Humphrey, individually, won $2,140 on one football game and one horse bet, and in the same year lost $3,000 wagering. 4. Acquisition of Ellis Co. Property by Use of Notes Previously Charged Off On January 1, 1941, Joe A. Humphrey Company held notes executed by Ellis Petroleum Company in the aggregate face amount of $63,758.25. The investment of Joe A. Humphrey Company in these notes amounting to $42,200, was charged off by Joe A. Humphrey Company in 1939 as worthless and uncollectible with a resulting tax benefit. The amount charged off represented the entire basis of Joe A. Humphrey Company in the notes. At or about December 15, 1939, proceeding was *296 filed in the District Court of the United States for the Eastern District of Texas for the corporate reorganization of Ellis Petroleum Company and in this proceeding the Joe A. Humphrey Company, acting by and through Joe A. Humphrey, one of its parents, filed proof of its claim against Ellis Petroleum Company for the indebtedness in the amount of $63,758.25, which proof of claim was duly allowed in the amount stated and adjudged to constitute a valid and subsisting second lien on the property of the bankrupt, inferior only to administrative expenses and court costs in the reorganization proceeding, and the lien of the Mercantile National Bank securing its claim in the sum of $45,792.40, and to be of equal dignity and on a parity with the lien securing a claim of McClanahan & Venable whose claim was allowed by the court in the total sum of $45,725.16. On September 5, 1941, the Referee in Bankruptcy entered an order of sale directing the trustee to sell at public auction on the 15th of October, 1941, certain described property of the Ellis Petroleum Company, Bankrupt. The order of sale directed that the property be sold free and clear of all liens, claims and interest of every character *297 (except that certain equipment was to be sold subject to the rights of International Derrick & Equipment Company), and that all liens and credits of every character against the property were to be transferred to the proceeds of the sale without determination by the court of the validity and priority of such claims. It was further directed that the sale was to be made for cash, providing, however, "that in the case of any lienholder whose lien is inferior to the lien of the Mercantile National Bank at Dallas, a bid of not less than $25,000.00 cash together with an additional cash sum not less than the unpaid balance of the claim of the Mercantile National Bank at Dallas and all other liens prior to the bidding lienholder's claim shall be deemed a cash bid for the total amount of all of such cash and credit." At the sale so authorized Joe A. Humphrey Company was represented by Joe A. Humphrey and Lanham Crowley, attorney for the partnership. The bidding started at about $135,000 for the property offered for sale and the property was ultimately bid in by Joe A. Humphrey Company and McClanahan & Venable, jointly, for a final bid price of $160,000. There were other bidders at this public *298 auction, at least one of whom did not hold any obligations of the Ellis Petroleum Company. The sale was confirmed on November 8, 1941, the Referee in Bankruptcy having required the successful bidders to pay $10,155.87 in cash in addition to the $25,000 in cash required in the notice of sale. A contract was entered into on December 2, 1941, between the bidders and the Trustee in Bankruptcy whereby the bidders acknowledged the payment in cancellation of certain notes formerly held by the Mercantile National Bank and acknowledged "the payment of the further sum by Romer Bullington, Trustee, of $79,051.73, which has been paid and credited on the notes and liens of Joe A. Humphrey, F. L. McClanahan and R. H. Venable for such amount," and agreed to further acknowledge "the payment and credit on liens of an additional amount of $10,155.87 in the event the Court should find that such amount as provided * * * should not have been paid" in cash and should be ordered refunded to the purchasers. On December 3, 1941, the property was conveyed to Joe A. Humphrey to the extent of 60 percent and to McClanahan & Venable to the extent of 40 percent. The face amount of notes of Ellis Petroleum Co. *299 in the total amount of $79,051.73 which were collected in this transaction were allocable $47,431.04 to Joe A. Humphrey Company and $31,620.69 to McClanahan & Venable. By a later settlement agreement (1942) the above-mentioned amount of $10,155.87 was returned to Joe A. Humphrey Company and McClanahan & Venable. The notes involved above had been held by Joe A. Humphrey Company for more than 24 months. 5. Deduction of Browning Debt In 1940 C. F. Browning was drilling a well for oil on a lease in Fort Bend County, Texas, and had gotten the well down to the sand, the indications being that it would be a producer. Browning did not have the money with which to buy the pipe needed to bring the well in and Joe A. Humphrey Company agreed to assist him in obtaining the needed funds. The required financing was accomplished in the following manner: Joe A. Humphrey, acting for the partnership, Joe A. Humphrey Company, went with Browning to the Republic National Bank in Dallas and $8,500 was borrowed from that bank on demand note of Browning, endorsed by Joe A. Humphrey, acting for Joe A. Humphrey Company. If the well came in as a producer Joe A. Humphrey Company was to receive a $10,000 *300 oil payment out of one-half of the oil from the Browning interest as a bonus for endorsing the note. The well produced no oil but only salt water. Browning did not pay the $8,500 note to the bank, saying he did not have the money. In the latter part of 1941 Joe A. Humphrey Company paid it as endorser. This $8,500, plus interest, was repaid to the Joe A. Humphrey Company in January, 1942. Browning was in business during 1940, 1941 and 1942 as the owner of a gambling establishment at "Top of the Hill Terrace," between Dallas and Forth Worth. This establishment had been operating for about 20 years. Joe A. Humphrey Company had had previous profitable dealings with Browning. In 1940 Joe A. Humphery Company completed transactions with Browning beginning in 1936 and showing a book profit of $3,214 which profit was adjusted to $14,714 by the disallowance and addition by the examining revenue agent and respondent of items totaling $11,500 which are not contested. Joe A. Humphrey Company made a loan of $1,000 to Browning in November 1940, which was repaid on December 20, 1940. 6. Deduction of Intangible Drilling Costs On January 1, 1941, Joe A. Humphrey and Layton Humphrey became equal *301 partners in a partnership known as Humphrey Brothers. By instrument dated January 9, 1941, acknowledged January 11 and January 13, 1941, and upon an advance of $12,500 under date of January 27, 1941, to Ralph Howell, trustee, Joe A. Humphrey, acting for Humphrey Brothers, received from George E. Lilly for good and valuable consideration an option to purchase an undivided one-half interest in a certain oil and gas lease covering lands located in Evangeline Parish, Louisiana, known as the Ortega lease (and sometimes referred to as the Crown Central lease). The option was to purchase an undivided one-half interest in the lease under the terms of a contract placed in the hands of an escrow agent. Sometime prior to May 18, 1941, an option had been acquired from Lilly on a lease known as the Foret lease (and sometimes referred to as the Kirby Petroleum Company lease), in Evangeline Parish by an advance of $5,000. This lease had been acquired by Lilly from Kirby Petroleum Company in 1940. The Foret lease adjoined the Ortega lease. The option on the Ortega lease was not required to be exercised until three days after Lilly furnished Humphrey with an electrical log and core analysis of the *302 Wilcox sand at approximately 10,100 feet on Foret well No. 1, which was then drilling on the Foret lease. This well was lost and abandoned at 9,880 feet. Subsequent negotiations occurred between January and May, 1941, for the release of Humphrey's options by paying back the $17,500 he had advanced, but Lilly and his associates were unable to raise the money. By instrument dated and acknowledged May 24, 1941, the option was released and a mortgage contract and note were cancelled. By May, 1941, other parties had come into the picture, namely, Oil Incomes, Inc., and L. R. Thompson, an employee of one of its owners. On May 8, 1941, Joe A. Humphrey advanced an additional $10,000 for the purpose of completing the first well on the Ortega lease, known as Ortega No. 1. This was pursuant to an agreement reflected in a letter of May 9, 1941, under which Humphrey was to receive a one-half interest in the two leases subject to certain outstanding interests, and was to give to Lilly an oil payment on the properties and within thirty days enter into contracts with Lilly and Thompson for the drilling of two turnkey wells on the properties for $70,000 and $60,000, respectively. The above-described *303 arrangement was completely revised by subsequent negotiations and the final agreement appears in two letters dated May 24, 1941. One of the letters - to Oil Incomes, Inc. from Humphrey Brothers - recites confirmation of an agreement relative to Humphrey Brothers' purchase of a one-half interest in the Crown Cental and Kirby leases in which Oil Incomes, Inc., owned the other one-half interest. The letter continues: We are buying in on a basis of Two Hundred Thousand ($200,000) Dollars for two producing wells completed on either or both of said leases., that is to say, our one-half interest is not to cost us in excess of One Hundred Thousand ($100,000) Dollars, this being our full controbution on all costs of every kind and character incurred by us or our predecessors in title from date of acquisition of leases up to the time of completion of the second producing well into the tanks; provided, that if the well #1-A now drilling on the Kirby Lease [Foret] is a dry hole, or if any subsequent well drilled prior to completion of the second well as a producer is a dry hole, then the cost of any such dry hole shall be borne one-half by you and one-half by us, and such costs shall not be *304 computed in or considered as a part of the $200,000 basis. It is acknowledged that on said One Hundred Thousand Dollars, Humphrey Brothers have up to this date paid the sum of Eighty Thousand ($80,000) Dollars. The other letter of May 24, 1941, to Oil Incomes, Inc. and Humphrey Brothers from George E. Lilly and Lilly-Thompson Drilling Corporation recites that an attached statement in the total amount of $85,800.34 represents and covers all bills and expenses incurred to that time upon the Crown Central lease and an attached statement aggregating $51,836.72 represents all expenses incurred to that time on the Kirby lease, except those incurred in connection with well No. 1-A which are covered by drilling contract between the parties. The letter concludes: In consideration of our so guaranteeing the amounts of said bills, you agree to pay all bills shown on the attached statements which have not heretofore been paid and hold me harmless from same; provided that nothing herein shall be construed as requiring Humphrey Brothers to pay any amount of money in connection with either of said leases in excess of their liability up to the point of two producing wells completed into the *305 tanks as stipulated in letter of even date between them and Oil Incomes, Inc. in the sum of One Hundred Thousand Dollars, on which One Hundred Thousand Dollars, Humphrey Brothers have already paid the sum of Eighty Thousand ($80,000) Dollars. The unpaid bills listed were $6,665.82 in connection with Foret No. 1 well and $17,372.55 in connection with Ortega No. 1. As part of the agreement, Humphrey Brothers received an assignment of a one-half interest in the two leases by instrument dated May 18, 1941, and acknowledged by the assignors of Lilly and Thompson on May 23, 1941. The assignment expressly provided that the "assignment and all exceptions and reservations hereinabove mentioned shall be effective as of date of first production." There was no well completed and producing on these properties at the time of these agreements. Ortega No. 1 was nearing completion. On May 26, 1941, two drilling contracts were entered into between Lilly-Thompson Drilling Corporation called the "Contractor" and Oil Incomes, Inc. and Humphrey Brothers, called "Owners," one to cover a well on the Foret lease, Foret No. 1-A, and the other to cover a well on the Ortega lease, Ortega No. 2. Under the *306 contract the "contractor" agreed to furnish all labor, fuel and other intangible drilling and development items, and the "owners" agreed to furnish items which for the most part would classify as equipment. They agreed to pay the contractor $36,000 if the well was completed as a producer, and if drilled to a depth of 10,300 feet and was a dry hole to pay at the rate of $300 per foot or a total of $30,900. The Foret No. 1-A well was a dry hole and Humphrey Brothers paid its share thereof, $15,450, over and above the $100,000 purchase price of its interest in the leases in four installments from August 18, to October 8, 1941. This amount has been allowed as a deduction by respondent. The Ortega No. 2 well was completed as a producer in November 1941. The final payment on the purchase price of $100,000 for Humphrey Brothers' interest in these two leases with two completed wells thereon was made on November 6, 1941, in the amount of $671. This completed the payment of the last $20,000 of the purchase price paid after May 24, 1941. On May 24, 1941, the $80,000 of advances made theretofore had been applied on the $100,000 purchase price. Advances of $57,500 made on or before May 20, 1941, from *307 a "Trustee" account were repaid by check to that account on that date, and later advances and payments appear as debits on the ledger sheet of Humphrey Brothers covering these properties. On March 18, 1942, Oil Incomes, Inc. agreed to pay to Humphrey Brothers $18,586.64 in consideration of the latter paying for items totalling that amount in excess of $100,000 which Humphrey Brothers had agreed to pay on the basis of two producing wells completed in the tanks, as covered by the previous contracts between the parties. A note for the $18,586.64 was given by Oil Incomes, Inc., secured by mortgage which had been given to Joe A. Humphrey, dated May 26, 1941. Oil Incomes, Inc. in 1941 had no bank account. In the first Federal income tax return filed by it, Humphrey Brothers elected to charge intangible drilling and development costs to expense. 7. Depreciation - Ortega Lease The cost of equipment on each well in the Ortega lease was "assumed" in the notice of deficiency to be $12,000. The reserves of recoverable oil underlying the Ortega lease amounted to 50,000 barrels of oil for the interest of Humphrey Brothers of which 11,846.07 barrels were produced and sold within the taxable *308 year 1941. For the purpose of making a depreciation allowance for equipment installed on the Ortega lease a cost of $24,000 is allocable to Humphrey Brothers' interest. 8. Negligence Penalties Substantially the entire net income of each of the petitioners for the years here involved was received through the partnership Joe A. Humphrey Company. Throughout the calendar years 1940 and 1941 Joe A. Humphrey Company employed Harry Lichenstein as bookkeeper. He devoted about 50 hours a month and whatever additional time was required to the work. The partnership kept a cash journal and general ledger which were in balance when examined by the revenue agent. The revenue agent was unable to obtain original invoices in many instances although check stubs were available. The partnership had a practice in 1940 and 1941 of attaching the check in payment of a statement or invoice to the invoice and forwarding it to the payee. The nature of all adjustments to the income of Joe A. Humphrey Company which resulted in increases in income and which are not contested may be summarized as follows: (1) Amounts charged off as lease expense determined to constitute capital expenditures. Year 1940:
$2,153.65
Year 1941:
2,078.22
*309 (2) Claimed general expenses disallowed in the absence of acceptable evidence that they were deductible as business expenses of the partnership. Year 1940:
$5,458.09
Year 1941:
6,600.22
(3) Proceeds of oil runs of Smith "A" lease for November and December 1940 omitted from the books and paid to the former wife of Joe A. Humphrey in connection with a divorce settlement arrangement. Year 1940:
$895.00
(4) Stud fee income representing part of collections on a $16,000 contract, reflected on the books of C. Andrade III, but omitted from the books of Joe A. Humphrey Company. Year 1940:
$1,600.00
(5) Charge-off predicated upon endorsement liability on note not yet paid, made against income from unrelated transactions with C. F. Browning at the time of closing the profit from said transactions into Profit & Loss. Year 1940:
$8,500.00
(6) Additional commission income in closing C. F. Browning transactions determined to be due to failure to record $1,000 collected thereon in an earlier year, and a charge of $2,000 deemed improper upon the basis of available information. Year 1940:
$3,000.00
*310 (7) Amounts deducted on the books by checks charged to the T. P. Morgan account, which were deposited in a bank account styled J. A. Humphrey Farm Account, and admittedly used largely in improving a stock farm. Year 1940:
$6,200.00
(8) Amounts deducted as taxes determined to comprise taxes of a nonmember of the partnership and a fine. Year 1940:
$ 267.38
(9) Taxes paid determined to have accrued prior to purchase of farm. Year 1941:
$ 398.81
(10) Note discount realized; omission determined to have been due to fact that only cost and not face amount of note was shown on books. Year 1941:
$ 150.00
(11) Bonus; books determined not to reflect transaction clearly. Year 1941:
$ 590.00
Supporting data in connection with the substantial amounts claimed for traveling and entertainment expenses were not available. A large portion of the checks shown as general expenses had been given to certain hotels. Some of the checks were in large amounts and the records failed to disclose the purpose of the payment. Gasoline expenses, personal to members of the partnership, were deducted as partnership expense. *311 In every year since the formation of the partnership in 1931, a flat amount or percentage of general expense deductions has been disallowed for lack of substantiation. The classification of items as between the various accounts necessitated considerable guess work by the revenue agent. Information on the partnership books in a number of instances merely furnished a clue as to where to find the actual facts. The partnership had transactions with various individuals who kept the records of such transactions and handled the funds and the partnership was advised of the results of such ventures by statements furnished by those persons. The information regarding such dealings was known to the bookkeeper of the partnership only if furnished to him by Joe A. Humphrey. The bookkeeper knew only what was shown on the partnership books and what Joe A. Humphrey told him. In making up the income tax returns of the partnership of Joe A. Humphrey for the years 1940 and 1941 and of the partnership and members in prior years the bookkeeper did not go to the offices of other individuals with whom the partnership had dealings to check the accounts. While all items which went to certain bank accounts *312 were recorded on the partnership books two bank accounts were found by the revenue agent at the Republic Bank which were not disclosed on the books of the partnership. One was in Joe A. Humphrey's name and took care of the money on the Morgan deal. The other was to take care of the funds expended on a farm that Humphrey had purchased and the amount transferred to that account was charged as an expense on the partnership books by means of charges to the Morgan account in two amounts totaling $6,200. The bookkeeper of the partnership told the revenue agent that he did not know anything about the farm account. No gains or losses in any amounts from wagering transactions were recorded on the books or records of the partnership of Joe A. Humphrey Company or of Joe A. Humphrey, individually, in 1940 or 1941. Part of each deficiency here in question was due to negligence within the meaning of I.R.C., Section 293. Opinion 1. After allowance in previous years of depreciation deductions based upon the cost of the total equipment on each leased property, without reference to ultimate salvage value, respondent, in the years in question had reduced the remaining depreciation *313 basis by the amount of such anticipated salvage after the completion of the operation. Petitioner, without attacking the salvage value determined, seeks to reduce its effect by urging that a portion of the depreciation previously allowed should be allocated to the salvageable equipment and the remaining basis increased accordingly. But the prior depreciation stands as depreciation "allowed," [1] and the basis for depreciable property for the taxable years must be determined with reference thereto. The remaining basis, adjusted in the tax years to true conditions, will permit petitioners to recover the full amount of their unrecovered capital investment in the depreciable property over its remaining useful life. The law permits no more, Helvering v. Virginian Hotel Corporation [of Lynchburg], 319 U.S. 523. Respondent's determination is sustained. 2. Decision of a portion of the dispute relating to the addition to 1940 income of Joe A. Humphrey Company of the $7,000 note given by Andrade is contained in our findings. Respondents' action is sustained in part by our factual conclusion *314 that the note had value when received. Although the notice of deficiency failed to specify this item and recourse to the agent's report was necessary to identify it, the pleadings frame this as one of the issues and the burden of proving the incorrectness of the deficiency amount remained with petitioners. So much was decided at the hearing. There was a complete failure to show any lack of financial responsibility by Andrade. Petitioners' further claim that the note was not enforceable by reason of a failure of consideration is not persuasive. It is inconsistent with the intention to collect the note, as expressed by Joe A. Humphrey to the revenue agent, at a period beyond that fixing its accruability for the year in question. Petitioners' further dealings with Andrade indicate the lack of substance to any defense on his part of the note. And its ultimate collection is even more conclusive. Nor do we consider the facts as establishing that the note was received by Joe A. Humphrey Company for Morgan's account or in any other capacity than in its own behalf. On the foregoing we sustain respondent's action in including the $7,000 note in the gross income of the partnership for 1940. *315 3. The deficiencies assailed under this issue are by reason of increases in Joe A. Humphrey Company's 1940 income of $3,459.97 and $2,140 income for 1941 for Joe A. Humphrey, individually. We are satisfied that the item for 1940 represents gambling winnings of petitioner Joe A. Humphrey, individually, for that year and not those of the partnership. But petitioner urges that he has made a showing of gambling losses for 1940 and 1941 in excess of the gambling gains for those respective years. Disallowance of these gambling losses might be urged upon three different grounds: (1) that the transactions were illegal and, therefore, not deductible, H. S. Anderson, 35 B.T.A. 10; (2) that they were not incurred in a transaction entered into for profit, [2]Louis D. Beaumont, 25 B.T.A. 474, affirmed (App. D.C.), 73 Fed. (2d) 110, certiorari denied, 294 U.S. 715; and (3) that they do not comply with the statutory requirement with respect to such losses. *316 The first and third objections can be summarily dismissed. Under Internal Revenue Code, [3] section 23 (h), the distinction between legal and illegal gambling transactions has been eliminated. [4] And while the same provision limits the deductions to amounts sufficient to offset gambling gains, our finding that petitioner Joe A. Humphrey is chargeable with income received from gambling transactions in an amount equal to that part of the asserted losses claimed as deductions satisfies this requirement. But the remaining consideration seems insurmountable, and this issue must be disposed of in accordance with it. In Louis D. Beaumont, supra, we said (p. 482): * * * The deduction allowed by the statute is of losses incurred in any transactions entered into for profit. The question whether the gambling transactions under consideration were entered into for profit is a question of fact, upon which the evidence before *317 us in these proceedings is entirely silent. We cannot proceed upon a presumption that all gambling transactions are entered into for profit within the meaning of the statute. The petitioner was a wealthy man * * *. He was not a professional gambler and was not dependent upon the success of his gambling ventures for a livelihood. It may well be that he indulged in games of chance for sport and recreation and without serious concern as to the financial results. Upon the evidence the respondent is sustained in disallowing the deductions. The present record contains no evidence upon that point. We conclude that this issue must be disposed of in conformity with the burden of proof, which for 1940 rested upon respondent, and for 1941 upon petitioner. 4. Respondent now concedes that the maximum extent of the income involved in this issue is $47,431.04, instead of the $63,758.25 determined. With respect to this item the notices of deficiency described the item as "representing the credit given the partnership in connection with the purchase by the Joe A. Humphrey Company of properties from the Ellis Petroleum Corporation"; and on brief respondent's position is that the "essence of the *318 transaction involving acquisition by Joe A. Humphrey of oil property from the trustee in bankruptcy of Ellis Petroleum Company is the application of the property to the payment of a debt which was due to Joe A. Humphrey Company which had previously been charged off as worthless to the extent that it represented actual cash outlay"; that the "acquisition of the property represents a bad debt recovery to the extent of the amount charged off, and the balance of the fair market value of the property applied to the payment of the notes is in the nature of interest received." Petitioners do not contend that the transaction does not result in income. Their only contention is that it qualifies for longterm capital gain rates, the note having been held longer than the required period. Petitioners' theory is that by virtue of the bid at the public auction it became indebted to the Trustee in Bankruptcy, and together with McClanahan satisfied this liability by paying the Trustee $35,155.87 cash, assuming the Mercantile Bank lien against the property of $45,792.40 and applying on the bid price the indebtedness of Ellis Petroleum Company in the total face amount of $79,051.73, of which Joe A. *319 Humphrey Company held $47,431.04. The parties deal with the transaction as though treatment as a sale or exchange on the one hand or as the collection of a bad debt on the other were mutually exclusive. But we see nothing that would prevent a taxpayer from buying a note in the face amount of $50,000 for $40,000, subsequently charging off its basis on the ground that the debt had become worthless, and still later if the debtor's condition sufficiently improved, selling the note for the full amount of $50,000. In that event, collection of the $40,000 previously charged off would clearly be ordinary income, National Bank of Commerce of Seattle, 40 B.T.A. 72, affirmed (another issue) (C.C.A., 9th Cir.), 115 Fed. (2d) 875, and the $10,000 profit would be capital gain. Cf. Peninsula Properties Co., Ltd., 47 B.T.A. 84. Collection of deductions previously taken, such as bad debts, taxes, and the like, is treated as ordinary income and not capital gain because the full amount of the charge-off constituted an offset to ordinary income, and its collection can operate as an effective cancellation of the prior income tax advantage only if it is so treated. *320 Putnam National Bank, 20 B.T.A. 45, affirmed (C.C.A., 5th Cir.), 50 Fed. (2d) 158. See Central Loan & Investment Co., 39 B.T.A. 981. At least that is true where, as here, there was a tax benefit from the full charge-off. See Internal Revenue Code, section 22 (b); National Bank of Commerce of Seattle, supra.Collection is nonetheless real if it is made by receipt of property or by the cancellation of another debt. Houghton & Dutton Co., 26 B.T.A. 52, 59, see Peninsula Properties Co., Ltd., supra. Applying these principles to the present issue we conclude that the full amount of the prior charge-off was ordinary income when collected whether through transfer of the bankrupt's property or by set-off against the trustee's claim. The difference between that amount and the $47,431.04 could be interest, as respondent contends - Helvering v. Midland Mutual Life Insurance Co., 300 U.S. 216 - or capital gain, depending on the facts. Since the record is silent on the subject we must treat the facts as most unfavorable to petitioner, upon whom the burden lay. There being no question *321 that the fair market value of the property was sufficient to support the full amount now charged against petitioners - cf. Nichols v. Commissioner (C.C.A., 6th Cir.), 141 Fed. (2d) 870 - this issue is disposed of in respondent's favor. 5. Petitioners proceed as though the fact that they were called upon as endorser to pay C. F. Browning's note for $8,500 in 1941 established their claim to a deduction at that time. Such might be the case if their own claim was then uncollectible. Shiman v. Commissioner (C.C.A., 2nd Cir.). 60 Fed. (2d) 65. But that would depend upon Browning's financial condition. Evidence in this respect is meager and inconclusive. It is not inconsistent with the manner in which the transaction was carried out to regard it as a method of taking over the bank's loan to Browning. At least such was its legal effect. See Vernon's Ann. Civ. Stat. (Texas), art. 5939; Fox v. Kroeger, 119 T. 511, 35 S.W. (2d) 679. There was no showing that the debt was bad when acquired. And payment of the amount due, together with interest, within a few months, tends to sustain the view that it was not. On this issue respondent is sustained. *322 6. As this issue is presented by the parties, it may be resolved upon answer to the question of whether the acquiring transaction was a purchase of the leaseholds with two completed productive wells thereon or was a purchase of the leaseholds followed by a drilling contract, upon which Humphrey Brothers was equally obligated. The ultimate question is the deductibility of intangible drilling expenses. Cf. F.H.E. Oil Co. v. Commissioner (C.C.A., 5th Cir.), 149 Fed. (2d) 238. It may be true, as respondent urges, that "The fact that Humphrey Brothers apparently obtained title before the drilling of the wells was completed would not change the nature of the transaction." But in the process, in which we are now engaged, of determining the true nature of the somewhat ambiguous agreement of the parties, their actual conduct and the apparent interpretation they themselves gave to the arrangement serve the function, not of changing the nature of the transaction once that has been settled, but of discovering it in the first place. The unquestionable receipt by petitioners of their unconditional interest prior to completion of the second well is so inconsistent with the assumption *323 necessary to respondent's position, - that they acquired no ownership interest until the property had been improved with two producing wells - that we think the correct interpretation of the arrangement is that upon which petitioners insist. It does appear, however, that not all of the sum claimed was expended for the permitted purpose, respondent's assertion to that effect having met with no challenge from petitioners. The correct amount can apparently be computed by a process of allocation. This should be done in the computation unler Rule 50. 7. While a deficiency notice is not ordinarily proof of the facts stated, see Charles F. Ayer, 7 B.T.A. 324, 328, affirmed (App. D.C.), 26 Fed. (2d) 547, the parties here have in effect eliminated from dispute the cost of the depreciable equipment, respondent having "assumed" it in the notice of deficiency and petitioners having accepted the assumption. All of the figures necessary to compute the depreciation claimed by petitioners are accordingly set forth in our findings and the proper amount should be given effect in the Rule 50 computation. 8. Our ultimate finding of fact on this issue indicates our conclusion *324 on the evidence that petitioners have not overcome the effect of respondent's determination that they are subject to the 5 percent penalty for negligence. Unlike the fraud penalty petitioners had that burden. Gibbs & Hudson, Inc., 35 B.T.A. 205, 211. There are, moreover, many instances shown by the record which justify the penalty, such, for example, as the charging of all individual expenditures for automobile gasoline to business accounts, and the failure to have many transactions directly reflected in the firm's books. For the most part, the latter are not matters of judgment and could not be founded upon mistaken application of the law. They are affirmative evidence of negligence. Respondent's imposition of the penalty is sustained. Decision will be entered under Rule 50. Footnotes
*. Now deceased.↩
1. Internal Revenue Code, section 114 (b) (1)↩; section 113 (b).
2. "SEC. 23. DEDUCTIONS FROM GROSS INCOME. "In computing net income there shall be allowed as deductions: * * * * *
"(e) LOSSES BY INDIVIDUALS. - In the case of an individual, losses sustained during the taxable year and not compensated for by insurance or otherwise - "(1) if incurred in trade or business; or "(2) if incurred in any transaction entered into for profit, though not connected with the trade or business; or "(3) of property not connected with the trade or business, if the loss arises from fires, storms, shipwreck, or other casualty, or from theft. No loss shall be allowed as a deduction under this paragraph if at the time of the filing of the return such loss has been claimed as a deduction for estate tax purposes in the estate tax return."↩
3. "SEC. 23. * * * "(h) WAGERING LOSSES: Losses from wagering transactions shall be allowed only to the extent of the gains from such transactions." ↩
4. Report, Ways and Means Committee (73rd Cong., 2nd Sess., H. Rep. 704), p. 22.↩